The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| R.D. and C.D.,<br><br>              Plaintiffs,<br><br>   v.<br><br>BOY SCOUTS OF AMERICA, a congressionally chartered corporation, authorized to do business in Washington; and CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS, a foreign corporation,<br><br>              Defendants. | NO.  2:10-cv-01006 RBL<br><br>CHURCH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>NOTE ON MOTION CALENDAR: December 16, 2012<br><br>ORAL ARGUMENT REQUESTED |

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
No. 2:10-cv-01006

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

*[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.*

*Nelson v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).

*We are also mindful of the position of the defendants who could be subjected to liability based upon conjecture and speculation.  To allow a judgment against an innocent defendant would be as great an injustice as denying plaintiff a recovery.*

*Clift v. Nelson*, 25 Wn. App. 607, 611, 608 P.2d 647, 649 (1980).

## I.    INTRODUCTION

Corporation of the President of The Church of Jesus Christ of Latter-day Saints ("the Church") submits this Memorandum in Support of its Motion for Summary Judgment.

Plaintiffs, brothers R.D. and C.D., seek to hold the Church liable for sexual abuse allegedly committed 45 years ago by Gary Reese, a family friend and fellow Church member. Plaintiffs allege various negligence theories, each of which rises or falls on the allegation that the Church knew that Reese posed an abuse risk but failed to protect them.  There is zero evidence that Reese abused anyone prior to his alleged abuse of the plaintiffs.  Plaintiffs' self-serving claims that they reported their abuse to the Church is their sole evidence of notice.  They claim that they told their mother of the abuse, and in turn, told the local Church clergyman (the "bishop," in Church terminology), whose name neither plaintiff can remember.  The other participants in these alleged conversations—Plaintiffs' mother and the bishops who served during the relevant period—are dead.

Plaintiffs' claims fail as a matter of law because the Church had no prior notice that Reese posed a risk to abuse.  Plaintiffs do not know who got abused first—R.D concedes he could have been abused before or after C.D.  Given that it is pure guesswork who got abused

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 1
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

first, neither plaintiff can use the other's alleged report of abuse as evidence of prior notice to the Church.

As to C.D., he alleges that Reese abused him eight times.  He testifies he did not notify anyone in the Church until the same evening as the final act of abuse, and that the last act of abuse occurred almost immediately after his meeting with the bishop.  There is no evidence the Church had any notice about Reese prior to the first seven incidents of abuse.  Thus, at the very least, this Court should grant partial summary judgment dismissing C.D.'s claim based on those events.  In addition, however, there is no evidence the bishop—with notice for just a brief period of perhaps less than one hour—could have prevented the final (eighth) incident.  Even *plaintiffs'* expert, Gary Schoener, concedes he cannot fault the Church for not preventing an act of abuse that happened immediately after the alleged notice.

As to R.D., he claims a single act of touching, followed *two weeks later* by a conversation with his mother.  He has told three conflicting stories about informing his mother of the abuse— two of which do *not* involve R.D. also having a meeting with the bishop upon which he now bases his claim of notice.  However, even if such a meeting occurred, as we assume for purposes of this motion, R.D.'s testimony does not prove the Church had notice of Reese's risk prior to his abuse of R.D.  R.D. claims the bishop told him during the meeting that "we already know about Gary."  Even if one were to assume the bishop was referring to knowledge about abuse, which is by no means the only possible inference, it is entirely speculative whether the bishop's knowledge was acquired more or less than two weeks earlier.  If such knowledge had been acquired within the prior two weeks, such knowledge would have *followed* the abuse of R.D. Because a jury cannot base a verdict on speculation, R.D.'s claim fails.

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 2
No. 2:10-cv-01006

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

Finally, the Church contends that Washington's extended statute of limitations—by which plaintiffs have been allowed to wait over 40 years and until all critical defense witnesses are dead before filing this suit—violates federal due process as applied to this action.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### A.     Background on the Parties and Mr. Reese

Alleged perpetrator Gary Reese was born on August 2, 1938.  Reese Dep. at 13:21–22. Plaintiff R.D. was born on August 23, 1952.  R.D. Dep. 82:14–15.  Plaintiff C.D. was born on June 19, 1956.  The alleged acts of abuse occurred between 1966 and 1969, when R.D. was 14–16 years old, and C.D. was 10–12 years old.

At the times relevant to this case, Reese, R.D., and C.D. were members of the LDS Church.  Amended Complaint ¶¶ 7, 8.  The LDS Church has roughly six million members in the United States, 14 million worldwide.

The Church's local congregations are called "wards" and are led by a "bishop" who has been called to serve the congregation.[2]  The lay clergy who serve as bishops come from any vocational background.  They keep their regular employment and perform their clerical functions in their free time.  Similar to clergy in other faiths, a bishop may counsel church members in spiritual and personal matters, and perform ceremonies such as weddings and funerals.

The LDS Church is a participatory church.  Every member is expected to serve in some volunteer capacity, such as leading music or teaching a class.  These volunteer positions are referred to as "callings."  Members rotate frequently through various callings.  A member of the

---

[1] These facts are set forth as undisputed solely for purposes of this motion for summary judgment.  The Church reserves the right to dispute plaintiffs' evidence at trial.

[2] This background information about the LDS Church is presented in *Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 122 Wn. App. 556, 569, n. 3, 90 P.3d 1147, 1154 (2004).

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 3
No. 2:10-cv-01006

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

congregation might be called to teach a class for a few months and then will be replaced by someone else and asked to fill another position.  Having a calling is nothing unique.

During 1965–68, Reese was a member of the Tacoma 5th Ward.  Reese Dep. at 33:5–7.  Plaintiffs were also members of the Tacoma 5th Ward.  Like most adult members, Reese held volunteer callings at various times.  Plaintiffs contend he was a "Scout leader," but there is no evidence he was ever called to such a position.  R.D. admitted he does not know whether Reese was a leader in the scout troop sponsored by the ward unit, and does not remember Reese being called to be a leader.  R.D. Dep. at 85–86 ("I never knew whether he was a counselor or a Scoutmaster or a Scout leader or what he was") and 159.  C.D. testified he was a cub scout when the first act of abuse occurred and through June 1968, when he turned twelve.  C.D. Dep. at 16:7–13.  C.D. could not recall if Reese had a formal leadership role in the ward pack.  C.D. Dep. at 187–88.  Reese is not listed in the Pack 3190 rosters in any capacity.  Dkt. 178, Ex. A.  Like his brother, C.D. could not recall whether Reese was ever called to be a Scoutmaster for the ward troop.  C.D. Dep. at 191.  For purposes of this motion the Church does not dispute that Reese may have participated in some capacity in the Boy Scout troop, likely as a merit badge counselor who would work with scouts to progress to higher rank through obtaining merit badges.  Anyone can be a merit badge counselor, not just scout leaders.  Being a merit badge counselor is not a church calling.  Dennis Scott Dep. at 14:19–23.

Both R.D. and C.D. confirm that Reese was a "personal friend" of plaintiffs' mother, and that as such he visited their house.  C.D. Dep. at 188:11–15; R.D. Dep. at 114:7–11, 18–23.  Plaintiffs' older brother, Mark, "spent a lot of time" with Reese as friends.  C.D. Dep. at 194:16.  R.D. was often in the car with Mark when Mark would go to Reese's house and, thus, he too

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 4
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

spent a lot of time there.  In short, much of the interaction between plaintiffs and Reese was

unrelated to the Church or scouting.  C.D. Dep. at 195:9–11.

**B.      Plaintiffs' Allegedly Repressed Memories**

Both R.D. and C.D. claim that they never once thought about Gary Reese or the alleged

abuse for more than 40 years until Mother's Day 2010 when they were drinking around a

campfire and began to think that Reese might have molested them.  C.D. Dep. at 99:1–10; R.D.

Dep. at 118:11-18.

Although C.D. alleges the most severe kinds of abuse, he claims he had total amnesia

about the abuse.  C.D. Dep. at 10:5 ("I forgot about it.")  At the time of the campfire

conversation, the alleged abuse did not return in a proverbial "flash" of recollection.  C.D. states:

> I can't remember exactly who brought [it] up, but Gary Reese's name, and all of a
> sudden Randy [R.D.] said, you know, I think I was abused by him.  And I just sat
> quietly for a minute and I sat back and said, you know what, *I think maybe
> something happened to me too.*

C.D. Dep. at 99: 5–8 (emphasis added).  Even then, he did not recall the specifics of the abuse—

"I had to wait until later when I could – you know, I talked to Randy [R.D.] and found out what

happened to him, and he said to sit down and think it all over."  *Id*. at 101:25–102: 4.  C.D. then

spent a "couple of days of just thinking about it and jotting down some notes."  *Id.* at 100:25–

101:11.

R.D. testified to the same lack of memory until the campfire, "[n]ever," "[n]ot once" even

thinking of Reese or the abuse for more than 40 years.  R.D. Dep. at 116:2–4, 16–18; 117:17–23.

**C.      The Alleged Abuse**

Reese allegedly abused Plaintiffs sometime between 1966 and 1969, although the precise

dates cannot be determined from the testimony.  Since R.D. states he was abused between the

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

age of fourteen and sixteen, and he was sixteen until August 1969, that date serves as the end-date of the possible abuse.

### 1.    C.D.'s Alleged Abuse and Report to the Bishop

C.D. alleges eight instances of abuse, with the last occurring in the summer of 1968. The first allegedly occurred during a cub scout meeting of some sort when C.D. was in fifth grade, during 1966 or 1967.[3] "I just remember Gary Reese touching me . . . feeling the front of my pants." *Id*. at 15:19–24. C.D. did not tell anyone about it. *Id*. at 16:25–17:1.

Plaintiff C.D. alleges several more acts of abuse, including rape by Reese, culminating in the final abuse event in the summer of 1968. C.D. did not tell anyone about any of the abuse as it was ongoing. C.D. Dep. at 20:2–3; 22:21–22; 30:8–10; 39:11–14; 42:22–23. In one such event, C.D. contends Reese orchestrated anal sex between C.D. and a neighbor boy, Peter Arnold. C.D. Dep. at 40:15–16. Arnold already knew he was a homosexual at the time. Arnold Dep. at 19:4–7. Completely independent of Reese, Arnold and C.D. had already engaged in mutual touching of each other's genitals. *Id*. at 38:25–39:21. Arnold recalls being naked and lying with C.D. in the presence of some clothed man, but denies having any anal sex with C.D. *Id*. at 32:3–6.

The eighth and final incident, an alleged rape by Reese, occurred in 1968, when C.D. was about twelve. "That was after I joined the Boy Scouts and I know it had been after I was ordained a deacon, so it was in '68." C.D. Dep. at 43:20–44:23; *see also, id*. at 13:9, 14:7–11 (his best recollection is the last abuse event was in 1968). This event happened "the very night" C.D. allegedly told the bishop about the Reese abuse. C.D. Dep. at 56:25.

---

[3] C.D. placed the first abuse event in fifth grade, or 1967. C.D. Dep. at 16:10, 17:9-11.  Later in his testimony, he referred to his fifth grade as 1966. *Id*. at 39:17-21.

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 6
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

2.      **R.D.'s Alleged Abuse**

R.D. says he was molested by Reese on one occasion.  A "bunch" of boys were at Reese's house and were wrestling.  R.D. Dep. at 73:19–25.  R.D. got hit hard "in the testicles." R.D. Dep. at 74:4–14.  Reese took R.D. inside his house, laid him on a bed, told him to take his pants off, and then put cream on his genitals.  R.D. Dep. at 74:21–75:19.  R.D. cannot remember precisely when this happened but puts it when he was "[b]etween 14 and 16."  R.D. Dep. at 82:20.  This time frame equates to August 1966 through August 1969, when he turned seventeen.

**D.      Plaintiffs Do Not Know Whose Abuse and Alleged Report to the Bishop Came First**

C.D. testified the final act of abuse was in 1968.  C.D. Dep. at 13:9, 14:7–10.  This was the same night he had a meeting with the bishop in which he discussed abuse by Reese.  *Id*. at 56:19–25.  R.D. testified that he met with the bishop two weeks after his abuse.  R. D. Dep. at 93:16–94:21.  ***R.D. does not know whether his abuse, and hence his alleged meeting with the bishop, occurred before, after, or contemporaneous with the abuse of C.D.***  *Id*. at 157:21–24.

Graphically, the timeline of relevant events is as follows:

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

**E.      The Alleged Meetings With the Bishop**

**1.      C.D. Allegedly Reports the Abuse to His Mother and an Unnamed Bishop**

At his deposition, C.D. testified he revealed to his mother that he had engaged in some homosexual activity "with some boys" and with Reese.  *Id*. at 60:9–61:20.  "She said she was going to talk to the bishop."  *Id*. at 62:20.

The next evening, C.D. was at the church at a scout meeting when the bishop pulled him aside and said he had spoken to C.D.'s mother.  *Id*. at 63:1–5.  C.D. cannot remember the bishop's name.  *Id*. at 47:9–12.  C.D. thinks that the bishop asked him about the abuse "because my mother had talked to him."  *Id*. at 52:7–8.  "The bishop asked me if I was being abused or if I had – no, the bishop asked me if I had any kind of homosexual activity . . . .  And I said yes, I've had homosexual activity with Gary Reese."  *Id*. at 52:12–20.  The bishop "prayed me a long, long prayer."  *Id*. at 55:16.

Following the alleged meeting with the bishop, C.D. returned to the scout meeting. When the meeting ended, Reese then allegedly found C.D. and asked him what he had discussed with the bishop.  C.D. Dep. at 57:1–10.  Reese then took C.D. to a room in the building that had a baptismal font and abused him for the last time.

**2.      R.D. Also Reports Abuse to His Mother and, Maybe, the Bishop**

About two weeks after R.D. was abused at Reese's home, R.D. told his mother about it. R.D. Dep. at 93:11–94:4.  R.D. has told several different versions of what happened next.

Version 1:  This version is contained in typewritten notes dated May 19, 2010, shortly after his campfire epiphany.  In these notes, R.D. states he told his mother Reese had molested him.  In R.D.'s words, "She dismissed the idea that Gary had molested me and said that he did

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

not mean anything by it."  Rosenberger Decl. Ex. 1, p. 1.  R.D. does not mention any meeting with a bishop.

Version 2:  In an interrogatory response, R.D. abandoned his prior, but as-yet undiscovered, story of his mother "dismiss[ing]" the claimed abuse.[4]  In this version, his mother, but not R.D., talked to the bishop.  "I informed my mother (LDS church secretary) and *she told me* that the church's bishop had been informed, that he acknowledged he knew about Gary Reese molesting me, and had disciplined Gary Reese and forgiven him."  Ex. 2 (emphasis added).  Apart from the fact that R.D. added a new, hearsay element of the story—his mother's purported statement about what the bishop purportedly said—the story itself makes no sense.  How could the bishop have told the mother that "he knew about" the molestation even as the mother was allegedly reporting R.D.'s abuse for the first time?

Version 3:  At his deposition, R.D. claimed for the first time that upon reporting the abuse to mother, his mother took him to a meeting with the bishop.

> And then she says, well, I'm gonna call the bishop.  So she calls the bishop, gets somebody on the – or talks to somebody on the phone, and throws me in the car and we go marching down to the church . . . .  [A]nd we meet with the bishop and we go in his office or whatever.  And so my mom tells him what's going on.

R.D. Dep. at 93:15–94:21.  R.D. cannot remember the bishop's name or anything about him.  R.D. Dep. at 97:14–24.  According to R.D., the bishop allegedly said "we already know about Gary . . . we're dealing with this and Gary's being disciplined."  *Id.* at 95:1–8.  When questioned about the discrepancy between his interrogatory answer and his deposition testimony,[5] R.D.

---

[4] R.D.'s notes attached as Ex. 1 were discovered because plaintiffs' counsel supplied them to their expert psychologist.  They were obtained by defense counsel when they noted the expert's deposition and served a subpoena duces tecum.

[5] When R.D. was deposed, his notes reflecting version 1 had not yet been produced.

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 9
No. 2:10-cv-01006

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

claimed his interrogatory was "incomplete" and that "the more I thought about it, the more I remembered about what actually occurred." *Id.* at 109:2–10.

Even granting R.D. the benefit of all inferences, and we thus assume both that the meeting with the bishop occurred as described in R.D.'s final version of his story, and that the bishop's alleged statement "we already know about this" means that at the time of the meeting the bishop had gotten a prior report of Reese's sexual misconduct, *there is still no evidence the bishop received the report prior to the abuse of R.D.*, which R.D. himself states was two weeks prior to the bishop meeting.

**F.     Gary Reese Denies the Allegations**

Reese denies the allegations of abuse.  Reese Dep. at 227:15–228:1.  He has never been arrested, charged, or—until R.D. and C.D. came forward—accused of sexual abuse.

Also, plaintiffs' mother wrote Reese a loving letter in 2009 that belies plaintiffs' argument that she knew Reese had abused two of her sons.  Ex. 3.

## III.     ARGUMENT

The Church seeks summary judgment based on the lack of notice evidence.  The key here is the portion of the standard on summary judgment barring a party from relying on mere conjecture or speculative inferences to create an issue of fact, for it is only through conjecture and rank speculation that plaintiffs can hope to establish notice for all but the last incident of abuse of C.D.

This Court must "scrutinize the evidence and reasonable inferences to determine whether there is sufficient probative evidence to permit 'a finding in favor of the opposing party based on more than mere speculation, conjecture, or fantasy.'"  *O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1467 (9th Cir. 1986) (quoting *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

Cir. 1985)); see also, *Curtiss v. Young Men's Christian Ass'n of Lower Columbia Basin*, 82 Wn.

2d 455, 465, 511 P.2d 991, 997 (1973) ("A verdict cannot be based on mere theory or

speculation.")  "The mere existence of a 'scintilla' of evidence is not enough to create a 'genuine

issue of material fact' in order to preclude summary judgment.  Likewise, mere allegation and

speculation do not create a factual dispute for purposes of summary judgment."  *Nelson v. Pima*

*Community College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).

> Testimony based on conjecture or speculation is insufficient to raise an issue of
> fact to defeat a summary judgment motion because "there is no issue for trial
> unless there is sufficient evidence favoring the nonmoving party for a jury to
> return a verdict for that party . . . .  If the evidence is merely colorable, or is not
> significantly probative, summary judgment may be granted."

*Ruiz v. Whirlpool, Inc.*, 12 F.3d 510, 513 (5th Cir. 1994) (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

**A.**    **The Church Owed No Duty to Protect Plaintiffs Against Abuse Where the Church**
       **Had No Notice That Reese Posed a Risk**

   **1.**    **Duty Is a Question of Law**

   As a diversity negligence case arising from acts occurring in Washington, Washington

substantive tort law applies.  "The threshold determination of whether the defendant owes a duty

to the plaintiff is a question of law."  *Fuentes v. Port of Seattle*, 119 Wn. App. 864, 868, 82 P.3d

1175, 1177 (2003).  "Summary judgment dismissal of negligence claims is proper if the

defendant owed no duty to the plaintiff."  *Funkhouser v. Wilson*, 89 Wn. App. 644, 653, 950

P.2d 501, 505 (1998).

   **2.**    **Duty Requires Prior Notice**

   When a sexual abuse plaintiff seeks to hold the defendant liable for negligently failing to

prevent the criminal act by a third party, a duty attaches *only* if the defendant had prior notice of

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 11
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

the assailant's potential to abuse.  *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 724, 985 P.2d 262, 275 (1999); *Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 141 Wn. App. 407, 445, 167 P.3d 1193, 1212–13 (2007).  This Court previously recognized this principle in a prior Order in this case:  "Washington law requires evidence of knowledge of the individual abuser's proclivities, not merely general knowledge of an unspecified risk of abuse."  Dkt. No. 86 at 2.

### 3.    *Doe* and *C.J.C.*

*Doe* and *C.J.C.* are the two critical cases in this area and both illustrate the application of these principles.

#### a.    *Doe*

Plaintiff Jessica in *Doe* was abused by her stepfather, Taylor, a "high priest" in the LDS Church.  One of the issues on appeal was whether the Church owed Jessica a common law duty of protection.  The trial court *dismissed* this claim on summary judgment.  The Court of Appeals affirmed:

> [T]he LDS Church, unlike the church in C.J.C., had not been warned that Taylor had previously abused children or made inappropriate advances towards them. Taylor moved into the family home in 1988.  It wasn't until 1994 or 1995 that Jessica sought Bishop Hatch's counsel regarding the abuse.  *The record shows that there were no allegations that the LDS Church possessed knowledge of the risk of harm prior to 1994 or 1995.*  The trial court did not err when it determined as a matter of law that there was no causal connection between Taylor's presence in the home, and as such, *the LDS Church did not owe a common law duty of protection to the plaintiffs.*

*Doe*, 141 Wn. App. at 445 (emphasis added).

#### b.    *C.J.C.*

In *C.J.C.*, a church representative, Schultz, received a phone call that the eventual molester, Wilson, had inappropriate sexual contact with a girl.  A year later, plaintiffs' family

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 12
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

moved to the congregation when plaintiffs' father became the pastor.  Schultz at that time was first chairman of the church's deacon board.  Schultz did nothing to warn the pastor or his three daughters about Wilson.  Meanwhile, Wilson was made a deacon, which gave him contact with and authority over children.  *C.J.C.*, 138 Wn.2d at 720.  Wilson sexually abused the girls, who later brought suit against the church.

Plaintiffs in *C.J.C.* argued the church owed plaintiffs a duty to protect them "against foreseeable harms perpetrated by a Church official whom the Church 'placed in authority and in close relationship to church children, knowing of the danger.'" *Id*. at 722.  The Supreme Court agreed, holding that where a special protective relationship exists, whether a duty exists depends on whether church officials "negligently caused the harm by placing its agent into association with the plaintiffs *when the risk was, or should have been, known*." *Id*. at 724 (emphasis added).

### 4.    Absent Prior Notice, Reese's Alleged Abuse Was Unforeseeable as a Matter of Law

Although neither *C.J.C.* nor *Doe* spoke in terms of foreseeability, other Washington courts applying the same principle hold that, absent prior notice of a risk to the plaintiff of sexual abuse, plaintiff's claim fails because the harm is unforeseeable as a matter of law.

"The concept of foreseeability limits the scope of the duty owed." *Christen v. Lee*, 113 Wn.2d 479, 492, 780 P.2d 1307 (1989).  Summary judgment is proper because no reasonable juror could find that Reese's abuse of the plaintiffs was foreseeable. *Minahan v. Western Washington Fair Ass'n*, 117 Wn. App. 881, 894–5, 73 P.3d 1019, 1026 (2003) (foreseeability is a question of law the court may decide "if reasonable minds cannot differ").

"[A]n actor ordinarily owes no duty to protect an injured party from harm caused by the criminal acts of third parties . . . .  The rationale for this rule is that criminal conduct is usually

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

not reasonably foreseeable." *Id.* "[A] person is normally allowed to proceed on the basis that others will obey the law." *Tortes v. King County*, 119 Wn. App. 1, 7, 84 P.3d 252 (2003). And "Washington courts have been reluctant to find criminal conduct foreseeable." *Nivens v. 7–11 Hoagy's Corner*, 133 Wn.2d 192, 205 n.3, 943 P.2d 286 (1997) (citing *Jones v. Leon*, 3 Wn. App. 916, 926, 478 P.2d 778 (1970) (criminal act "was so highly extraordinary or improbable as to be wholly beyond the range of expectability"); *Shelby v. Keck*, 85 Wn.2d 911, 541 P.2d 365 (1975) (criminal act was not reasonably foreseeable by liquor licensee); *Christen v. Lee*, 113 Wn.2d 479, 496, 780 P.2d 1307 (1989) (criminal assault not a foreseeable consequence of furnishing intoxicating liquor); *Minahan v. Western Washington Fair Ass'n*, 117 Wn. App. 881, 895, 73 P.3d 1019, 1026 (2003) (criminal conduct unforeseeable as a matter of law "[w]hen there is no evidence that the defendant knew of the dangerous propensities of the individual responsible for the crime and there is no history of such crimes on the premises.").

Several recent cases applied these principles in the context of sexual assaults and held as a matter of law that the assaults were not legally foreseeable where the defendant had no notice of prior sexual misconduct by the assailant. *Kaltreider v. Lake Chelan Community Hosp.*, 153 Wn. App. 762, 224 P.3d 808 (2009), *rev. denied*, 168 Wn.2d 1039 (2010); *Smith v. Sacred Heart Med. Ctr.*, 144 Wn. App. 537, 184 P.3d 646 (2008); *Boy 1, et. al. v. Boy Scouts of America*, 2011 WL 1930635 (W.D. Wa. May 19, 2011); *Boy 7 v. Boy Scouts of America*, No. 2011 WL 2415768 (E.D. Wa. June 13, 2011). Plaintiff in *Kaltrieder* was admitted for inpatient alcohol treatment at the defendant hospital, where a nurse repeatedly fondled her genitals. The court then held that the nurse's actions "were not foreseeable." *Id*.

> In determining whether sexual misconduct by a staff member is foreseeable, this court may look to whether there were prior sexual assaults at the facility or by the

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 14
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

individual in question.  Here, LCCH did not have knowledge of prior misconduct at the hospital or by Mr. Menard. . . .  Without evidence that Mr. Menard's conduct was known or reasonably foreseeable to LCCH, there was no duty to protect.

*Id*. at 767.

Two recent decisions that are closely on-point dismissed complaints where plaintiff failed to allege the Boy Scouts had prior knowledge of the risk posed *by the abuser*.  In *Boy 1*, this Court noted that "Washington has yet to impose liability on a church for the abuse of a member of the congregation at the hands of a church worker absent evidence that the church knew or should have know of *that worker's* deviant propensities."  *Boy 1*, at p. 11 (emphasis added).  In *Boy 7*, Judge Whaley of the Eastern District reasoned that "like the plaintiff in the LDS Church case [*Doe*], Plaintiff has not alleged that the BSA had been warned that the Scout Leader has previously abused children or made inappropriate advances towards them.  This is fatal to Plaintiff's negligence claims."  *Boy 7*, at p. 4.  In sum, the rule that emerges from all of these cases is there is no liability upon a church absent, at minimum, notice that the third-party abuser posed a risk of harm to the plaintiff.

**B.    There Is No Evidence That Rises Beyond Speculation and Conjecture That the Church Had Notice That Reese Was Dangerous**

Plaintiffs' first, second, and fifth causes of action all sound in negligence.  Specifically, for example, plaintiffs allege that Reese was under the "direction, supervision and control" of the Church (¶ 39) and that the Church "negligently retained and supervised Reese when [it] knew or should have known that Reese posed a threat of sexual abuse to children" (¶ 41) and "fail[ed] to prevent Reese from contact with R.D. and C.D" (¶ 42).  Plaintiffs similarly allege the Church had "actual and constructive notice that Reese had molested other minor students" and "continued to retain Reese, and continued to fail to supervise Reese." (¶ 73)  These allegations have proven to

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 15
No. 2:10-cv-01006

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

be false.  There is no evidence whatsoever that Reese abused anyone before the alleged abuse of

plaintiffs in this case or that the Church was aware of any prior abuse.

### 1.      No Notice as to C.D.

With respect to C.D., there is no evidence that the bishop knew Reese was a risk until the

very evening of the final act of abuse.  The only possible evidence of notice to the bishop prior to

the first seven acts of abuse against C.D. is R.D.'s testimony that he too spoke with the bishop

about Reese.  But, as discussed at the outset, that testimony cannot establish prior notice that

C.D. was at risk.  In fact, R.D. expressly states that his abuse, and hence his discussion with the

bishop, could have been subsequent to the abuse of C.D.  R.D. Dep. at 157:21–24.  Thus, C.D.

and his mother may have spoken with the bishop in the Summer of 1968 while R.D. spoke with

him in late-1968.  There is simply no way to know which came first—R.D.'s or C.D.'s meeting

with the bishop—other than to speculate.  Speculation is not evidence, and it cannot serve to

defeat summary judgment.  *Nelson v. Pima Community College*, 83 F.3d at 1081–82; *Ruiz v.*

*Whirlpool, Inc.*, 12 F.3d at 513.  As the Washington Court of Appeals stated in affirming the

dismissal of a tort claim on summary judgment:

> The fact that plaintiff has sustained an injury does not entitle him to put another
> party to the expense of trial unless there is evidence that the other party
> committed the wrong or caused the injury.  While we are sympathetic to
> plaintiff's position, he had his opportunity to present a prima facie case and
> failed to do so.  We are also mindful of the position of the defendants who could
> be subjected to liability based upon conjecture and speculation.  To allow a
> judgment against an innocent defendant would be as great an injustice as denying
> plaintiff a recovery.

*Clift v. Nelson*, 25 Wn. App. 607, 611, 608 P.2d 647, 649 (1980).

In sum, there is simply no evidence, or reasonable inferences from the evidence, that the

bishop knew that Reese posed a risk to abuse prior to any of the first seven acts of abuse of C.D.

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 16
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

## 2.        No Notice as to R.D.

Because of R.D.'s inability to recall when he was abused, this Court similarly cannot assume he was abused after C.D.  R.D.'s claim rests solely on his own testimony about the timing and substance of his alleged conversation with the deceased bishop.

R.D. testified he told his mother that Reese had abused him *two weeks after the abuse*. (R.D. Dep. 93:11–94:4.)  In response, his mother first called the bishop about the situation and then took R.D. to the bishop's office to discuss it further, where according to R.D. the bishop told him he already knew about Reese.  R.D.'s testimony does not establish the bishop knew of the alleged risk posed by Reese prior to the abuse of R.D.

The bishop's alleged statements are wholly ambiguous as to when the bishop learned there were concerns about Reese.  The bishop reportedly said "we already know about Gary," and "the church and the Boy Scouts are taking care of it"  R.D. Dep. at 95:1–8.  None of these statements suggests the bishop knew Reese was dangerous *before* he abused R.D.  At most, they may indicate that the bishop had notice before he spoke with R.D.  But how long before?  Months? A week? Days?  There is no way to know without speculating.  The bishop may have learned about Reese during the phone call earlier that day from R.D.'s mother and then quickly called scouting officials to begin dealing with it.  If anything, the present tense statement the church and the Boy Scouts are "taking care of it" implies the bishop had only recently learned of it.  If R.D.'s testimony is to be believed, it is possible the bishop learned of abuse by Reese from some other source during the two weeks between the abuse and when R.D. reported it to his mother and the bishop.

The reality is that we cannot know the answer to these questions, and thus any answer we attempt to provide is pure conjecture and speculation.  No witness who is alive and available to

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 17
No. 2:10-cv-01006

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

be a witness at trial will be able to answer the questions.  Assuming the inferences of prior

knowledge and no prior knowledge are equally possible, as a matter of law R.D.'s claim cannot

go to the jury.  "If there is nothing more tangible to proceed upon than two or more equally

reasonable inferences from a set of facts, and under only one of the inferences would the

defendant be liable, a jury will not be allowed to resort to conjecture to determine the facts."

*Schmidt v. Pioneer United Dairies*, 60 Wn.2d 271, 276, 373 P.2d 764 (1962).

## C.  As a Matter of Law, the Church Was Not Negligent in Failing to Prevent the Last Act of Abuse of C.D.

Based on his recovered memory, C.D. testified that shortly after speaking with the bishop

at the Church meetinghouse about Reese's abuse,[6] C.D. encountered Reese, who promptly seized

him, took him to the baptismal font (akin to a large tile hot tub), chastised him for talking about

the abuse and causing trouble, and then molested him one final time.  C.D. Dep. at 43:20–44:23.

There is no evidence the bishop knew or should have known Reese was on the premises

that night or that the bishop otherwise acted negligently in failing to prevent the final incident of

abuse.  The shocking speed with which Reese allegedly acted to seize and molest C.D.

immediately after he had spoken with the bishop about abuse was neither foreseeable nor

reasonably preventable.  Mr. Schoener, plaintiffs' own expert on standard of care for the

prevention and investigation of sexual abuse, found it impossible to fault the Church for not

preventing this final act of abuse.  Mr. Schoener was told to assume R.D. had not made a report,

and the only report to the bishop was C.D.'s on the evening of the last abuse against him.

---

[6] One inference from the bishop's initiation of this meeting is that he was not ignoring the claimed abuse, but was investigating what he had allegedly learned from C.D.'s mother the day prior.

**GORDON TILDEN THOMAS & CORDELL** LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

Mr. Schoener was then asked if there was anything the Church could have done to prevent the

abuse based on C.D.'s report.  His answer:

> Obviously the church would not have been able to prevent the specific acts of
> abuse that had  predated that specific awareness, and *it's not completely clear*
> *that what happened allegedly that night afterwards would have been prevented*
> *because I -- I don't hold that it's clear that the bishop had some immediate way*
> *to act.*

Schoener Dep. at 111:3–7 (emphasis added).  From the mouth of an expert for the plaintiff, this

is as much of an exculpation of a defendant's fault as one ever finds.

   This final event is thus, as a matter of law, not actionable.  The Court may view it as

failing for absence of duty (i.e., there was notice but it was unforeseeable that Reese would

immediately abuse plaintiff within moments of leaving the meeting).  Or, as Mr. Schoener

apparently believes, the Court may find the Church blameless—that is, no reasonable juror could

find the Church breached a duty of care—because there was simply insufficient time between the

meeting and the abuse to have done anything to prevent it.  Summary judgment must be granted

where no reasonable juror could find the defendant liable.  *Margolis v. Ryan*, 140 F.3d 850, 852

(9th Cir. 1998) ("to defeat a summary judgment motion, the non-moving party must demonstrate

that the evidence is such that a reasonable jury could return a verdict in his or her favor.").

   At minimum, however, even if the Court were to deny summary judgment as to the last

act, the Court should grant partial summary judgment and dismiss all claims based on the first

seven acts of abuse of C.D.

**D.    Negligent Infliction of Emotional Distress Is a "Bystander" Action.  It Is Not**
**Applicable to Plaintiffs' Claims of Direct Injury.**

   In addition to the deficiencies with plaintiffs' negligence claims in general, plaintiffs'

claim for negligent infliction of emotional distress is wholly inapposite and thus fails as to both

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 19
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

plaintiffs.  Negligent infliction of emotional distress is "a bystander action."  *Bishop v. State*, 77 Wn. App. 228, 233, 889 P.2d 959 (1995).  "The tort of negligent infliction of emotional distress is a limited, judicially created cause of action that allows a family member to recover for 'foreseeable' intangible injuries caused by viewing a physically injured loved one shortly after a traumatic accident."  *Colbert v. Moomba Sports, Inc.*, 163 Wn. 2d 43, 49, 176 P.3d 497 (2008).  But "[t]he class of bystander plaintiffs is restricted to those who were present at the scene of the accident . . . ."  *Id*. (quotation marks and citations omitted).

On its face, the claim of negligent infliction of emotional distress has no application to this case.  The Church is entitled to summary judgment on this claim.

**E.**   **Plaintiffs Claim for Fraudulent Concealment Fails as a Matter of Law**

As a part of their third cause of action for fraud, Plaintiffs allege a breach of a duty to disclose a material fact, which is sometimes referred to as fraudulent concealment.[7]  Even if this Court determines issues of material fact remain related to the issue of notice, plaintiffs still do not have a claim for fraudulent concealment.  Such claims arise when the plaintiff and defendant are parties to a transaction and the defendant fails to disclose a fact material to the transaction at hand.  Restatement (Second) Torts §§ 550, 551 (listing elements for fraudulent concealment and negligent nondisclosure); *Colonial Imports, Inc. v. Carlton Nw., Inc.,* 121 Wn.2d 726, 732 (1993) (Restatement § 551(2) "assumes that the duty will be invoked as between parties to 'a business transaction'"); *Favors v. Matzke*, 53 Wn. App. 789, 795–96 (1989) (Washington

---

[7]Plaintiffs have stipulated to dismissal of the portion of their third cause of action for intentional misrepresentation, and their fourth for "estoppels and fraudulent concealment."  Dkt. 187.  Despite the dismissal of the fourth cause of action, plaintiffs plainly retained in the stipulation their claim for breach of an affirmative duty to disclose, which here will be referred to as fraudulent concealment.

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 20
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

follows Restatement rule and citing examples of fraudulent concealment and negligent

nondisclosure cases, all of which involve business transactions).[8]

Here, even if plaintiffs could establish the Church had a prior knowledge of Reese's

abuse risk, and that the Church had duty to disclose such knowledge, plaintiffs' third cause of

action for fraudulent concealment should be dismissed because the alleged failure to disclose

was not material to a business transaction.

## F.    As Applied in This Case, the Extended Statute of Limitations for Claims Based on Child Sex Abuse Deprives the Church of Due Process

The Washington Supreme Court has held that the extended statute of limitations for

claims based on child sex abuse applies to claims against allegedly negligent institutions.  One

justice, however, accurately described the extreme difficulty the statute creates for an institution

seeking to defend itself against stale claims of sexual abuse:

> Any harm to a plaintiff who loses a cause of action by failing to bring it within the statute of limitations is outweighed by the harm to the defendants faced with stale claims.  Defendants' ability to present a meaningful defense is compromised over time.  Important evidence may be lost or forgotten.  In intentional tort cases against an abuser, the issue at trial will be whether the abuse occurred. . . .  In contrast, negligence suits against an organization rest on who in management knew about the abuser's propensity, when they knew it, and what they could have done to prevent the abuse from occurring.  Evidence (testimonial or documentary) of the mental state of the managers of an organization is particularly susceptible to loss and mistake with the passage of time.  Accordingly, requiring defendants to answer allegations of negligence so long after it occurred may limit their opportunity to produce exculpatory evidence. . .
>
> Furthermore, allowing stale claims against religious and community groups would have serious social repercussions.  Employers and other organizations will face a perpetual threat of liability for negligent omission that occurred decades earlier. . . .

---

[8] Fraudulent concealment may also toll the statute of limitations.  *E.g., Crisman v. Crisman*, 85 Wn. App. 15, 22–23 (1997).  Plaintiffs do not appear to be pleading fraudulent concealment for that purpose.

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 21
No. 2:10-cv-01006

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

> Extending the common law discovery rule to these cases would result in profound unfairness to the defendants.

*C.J.C.*, 985 P.2d at 288–89 (Durham J. dissenting).

This case is a prime example of the difficulty institutional defendants face in dealing with stale abuse claims.  C.D. is 55 and is suing for events that occurred when he was between 8 and 10.  R.D. is 59 and is suing based on abuse that occurred when he was between 14 and 16.  And this is all based on alleged recovered memories that had been totally repressed for more than 40 years.  On the most critical issue—whether the Church had notice of the alleged abuse—plaintiffs are the only living witnesses.  The plaintiffs' stories about going to their bishop could be totally fabricated and the Church would have no way to rebut them.  Plaintiffs cannot even remember anything about the bishops they allegedly told about the abuse.  Their mother—perhaps the most important witness of all—died shortly before plaintiffs claim to have first remembered the abuse.

Plaintiffs' claims were barred, and remained so for decades until the Washington legislature enacted an extended statute of limitations for claims based on childhood sexual abuse.  In *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 315 (1945), the U. S. Supreme Court discussed a legislature's decision to revive previously time-barred civil claims.  While the Court did not set forth a prohibition against this type of legislation, it explicitly stated that where its effect is to enact hardship or oppression it cannot be applied:

> The Fourteenth Amendment does not make an act of state legislation void merely because it has some retrospective operation.  What it does forbid is the taking of life, liberty, or property without due process of law.  Some rules of law probably could not be changed retroactively without hardship or oppression, and this whether wise or unwise in their origin.

*Id.*  Such hardship and oppressive effect is evident in the instant case.

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 22
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976) (citations omitted); *see also*, *In re Hansen*, 599 P.2d 1304 (1979) (due process requires "a full and meaningful opportunity to present evidence"). Statutes of limitation are designed to ensure that these requirements of due process are afforded to defendants. *Seagate Tech. LLC v. Dalian China Express Int'l Corp. Ltd.*, 169 F. Supp. 1146, 1159 (N.D. Cal. 2001) (underlying rationale of statute of limitations is to encourage promptness in bringing claims so that "the parties shall not suffer by loss of evidence from death or disappearance of witness, destruction of documents, or failure of memory"); *Burnett v. New York Cent. R. Co.*, 380 U.S. 424, 428 (1965) (limitations periods designed primarily to ensure fairness to defendants).

Where, as here, plaintiffs wait until all defense witnesses are dead and there is no one left to contradict their claims, the defendant is deprived of an opportunity to be heard in a "meaningful manner." *Mathews*, 424 U.S. at 330.

> [T]he inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately the events of the past.

*Barker v. Wingo*, 407 U.S. 514, 532 (1972). This is exactly the type of case that the United States Supreme Court had in mind when it ruled that, "some rules of law probably could not be changed retroactively without hardship or oppression, and this whether wise or unwise in their origin." *Chase Sec. Corp.*, 325 U.S. at 315.

As applied to this case, Washington's extended statute of limitations reviving plaintiffs' stale claims denies the Church due process. Without the revival afforded by RCW § 4.16.430, plaintiffs claims would have been barred long ago by the statute of limitations. As applied in this

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 23
No. 2:10-cv-01006

case, the extended statute of limitations, RCW § 4.16.430, denies the Church of due process.

The extended statute of limitations should not be applied and plaintiffs' claims should remain

time-barred.

## IV.    CONCLUSION

For the reasons stated above, the Church requests that this Court grant summary

judgment as to all claims of plaintiffs R.D. and C.D.

DATED this 23rd day of November, 2011.

**GORDON TILDEN THOMAS & CORDELL** LLP
Attorneys for Corporation of the President of The Church
of Jesus Christ of Latter-day Saints

By ___*s/ Michael Rosenberger*_____
Charles C. Gordon, WSBA #1773
Jeffrey I. Tilden, WSBA #12219
Michael Rosenberger, WSBA #17730
1001 Fourth Avenue, Suite 4000
Seattle, Washington 98154
Telephone: (206) 467-6477
Facsimile:  (206) 467-6292
Email:       cgordon@gordontilden.com
Email:       jtilden@gordontilden.com
Email:       mrosenberger@gordontilden.com

CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 24
No. 2:10-cv-01006

**GORDON TILDEN THOMAS & CORDELL** LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following.

Kevin P. Sullivan
ksullivan@sullthor.com

Thomas N. Petersen
litigation@blackchapman.com

Kelly P. Corr
kcorr@corrcronin.com

William R. Squires III
rsquires@corrcronin.com

Barbara J. Kastama
bkastama@corrcronin.com

G. Perrin Walker
pwalker@vjglaw.com

Francis S. Floyd
ffloyd@floyd-ringer.com

Thomas B. Nedderman
tnedderman@floyd-ringer.com


_____s/ Michael Rosenberger_____
Michael Rosenberger, WSBA #17730


CHURCH DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT – 25
No. 2:10-cv-01006

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292