UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| R.D. and C.D.,<br><br>                Plaintiffs,<br><br>           v.<br><br>BOY SCOUTS OF AMERICA, a congressionally chartered corporation, authorized to do business in Washington; CORPORATION of the PRESIDENT of the CHURCH of JESUS CHRIST of LATTER-DAY SAINTS and SUCCESSORS, a foreign corporation; and PACIFIC HARBORS COUNCIL, BOY SCOUTS OF AMERICA, fka MT. RAINIER COUNCIL, a Washington corporation.<br><br>                Defendants | CAUSE NO. 2:10-CV-1006<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT BOY SCOUTS OF AMERICA'S SUMMARY JUDGMENT MOTION**<br><br>**NOTE ON MOTION CALENDAR:  December 16, 2011** |

## I.    <u>INTRODUCTION</u>

By Mr. Sullivan:

Q. Were you ever a scout leader?

A. I was a bishop.

Q. So –

A. **Bishops are scout leaders.**

Deposition of James Ely, former Bishop of LDS Lakewood Ward 5 and Tacoma Stake President.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 1

The Boy Scouts of America ("BSA's") motion is narrowly limited to whether BSA had "prior notice" that Scout Leader Gary Reese was a danger to Plaintiffs before he abused them.  Motion, at 1. The Bishop of LDS Tacoma Ward 5, which sponsored Troop 190 in Lakewood, had received complaints about Reese before the abuse.  The Bishop was the agent of both LDS and BSA, and both defendants are charged with knowledge of their agent. The existence and scope of agency is almost always a question of fact for the jury.  For these reasons, Plaintiffs respectfully request this Court deny BSA's motion because the jury must decide these factually intensive issues.[1]

## II.      SUMMARY OF RESPONSE: THIS CASE SHOULD PROCEED TO TRIAL AGAINST BSA[2]

BSA has always controlled the reporting and dismissal of pedophile Scout leaders.  BSA expected – in fact, required – a local Scout Executive to follow a protocol (this protocol was promulgated in a written document called the Procedures for

---

[1] Whether or not BSA is liable for routine personal injuries suffered by Scouts is both irrelevant to its motion, and inapplicable to BSA's liability in this case. BSA's bylaws make three things clear: (1) BSA had the ultimate authority to decide who was allowed to be involved in Scouting; (2) BSA set the standards for the Scouting program; and (3) BSA made sure that it would materially benefit from keeping those standards. None of BSA's cases address this issue. *See, e.g. Mauch v. Kissling*, 56 Wn.App. 312, 783 P.2d 601 (1989); *Gordon v. Boy Scouts of America*, 2009 Wash.App. LEXIS 3141 (Wash.App. 2009) (unpublished case). These authorities concern BSA's liability for the negligence of a Scoutmaster or other Scout leader. Our issue is distinctly different – whether the BSA authorized chartered representative (like the Bishop here) is BSA's agent.

[2] Plaintiffs alleged in their Complaint that BSA is liable based on its failure to utilize its superior knowledge of child molester infiltration into BSA adult leadership ranks to protect children.  BSA's IV files show that BSA has always known of vast numbers of pedophiles in its organization.  Under controlling Washington law, Plaintiffs are not required to establish proof of BSA's direct knowledge of previous sexual assaults by Reese.  In *Niece v. Elmview Group Home*, 131 Wn.2d 39, 929 P.2d 420 (1999), a group home was found liable for sexual assaults committed at the home by its employee. Id.  Prior to discovering the assaults, the group home had no knowledge of the employee's dangerous propensities or direct notice of other sexual assaults he committed. Id.  In its critical holding, the *Niece* court held that the group home's lack of direct knowledge regarding the employee's dangerous propensities did not render his sexual assaults legally unforeseeable. Id., at 51.  While this Court has implicitly rejected this argument in the denial of Plaintiffs' Motion to Compel Production of the IV files, *see*, Order Granting BSA's Motion for Protective Order, Dkt. No. 86, Plaintiffs respectfully continue to assert their position this ruling was in error; and preserve this issue for appellate purposes.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 2

Maintaining Standards of Leadership for investigation and dismissal of the pedophile Scout leader.  Naturally, the initial report of child sex abuse of a scout typically came from the Scout troop itself.  Because BSA exercised complete control over the registration of every Scout volunteer, BSA also required the Scout Executive not only contact the national office (which in the 1960s was in New Jersey) but as well as to forward to the National office all relevant documents (letters, newspaper articles, interview, etc.) concerning the sexual abuse allegations against the scout leader.  These files were called the Confidential Files (today they are called the "Ineligible Volunteer") Files, and BSA kept their existence secret for generations from scouts and their parents.

BSA concedes the following key "notice" facts, as it must on this summary judgment motion:

- In 1967, Plaintiff R.D. and his mother complained to their LDS Bishop that Reese had molested R.D. Reese was a Scout leader in Lakewood Troop 190, sponsored by the LDS Ward.

- The Bishop told Plaintiff R.D. and his mother that **both the Mormon Church and BSA already knew about Reese** and "are taking care of it."

- In 1968, Reese repeatedly molested and raped Plaintiff C.D.  The boy and his mother reported Reese's abuse to the Bishop.

- A day or two later, C.D. again informed the Bishop that Reese had molested him.  But the Bishop turned a blind eye, and Reese raped the boy that night in the church.

As we explain in this brief, the Bishop was BSA's agent in 1967 and 1968 because:

- BSA, through its Bylaws and Charter, controls leadership standards for all adult volunteers.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 3

- BSA must approve the initial and all yearly registration of scoutmasters and all adult volunteers. Pursuant to BSA Rules and Regulations, each year, every single adult leader must reapply for membership in the BSA. Every adult's membership has to be approved by the BSA each year.

- BSA's Bylaws also control marketing, protection of the BSA brand, uniforms, merit badges, and the like, for the entire organization. BSA makes money from these sales.

- BSA's Bylaws state that BSA's expenses are paid from e Scouts' annual registration fees and from sales of publications and supplies (Article XXI). These fees and dues for <u>Boys Life</u> are collected for BSA by the troops. BSA cannot exist without such funding.

- BSA, through its Bylaws and Charter, controls all local councils, which cannot exist unless they adhere to BSA's bylaws. In turn, the local council's own bylaws must be approved by BSA. BSA also ultimately controls selection of the local Scout Executive.

- BSA, through its Rules and Regulations, controls the local units (Scout troops and Cub Scout packs) because BSA must initially approve and register the "Charter" of the "charter or sponsoring organization" for the unit. BSA must approve renewal of the charter organization each year.

- BSA provided the local units with instruction on how to provide for and monitor the safety of children in troops and packs. BSA provided such instructions to adult leaders, in the Scoutmaster handbooks, troop committee guidebooks, and other adult literature, and to the Scouts in the Cub Scout and Boy Scout handbooks.

- As the "chartered organization representative," the Bishop was "the manager of Scouting" for Troop 190 and he was "responsible for the operation of the Cub Scout pack and the Boy Scout troop. . ."[3] BSA required this representative to ensure that BSA's leadership standards were followed and that the scouts in Troop 190 were safe.

In sum, the Bishop – acting as BSA's "charter organization representative" – was

BSA's agent, including when Plaintiffs and their mother complained to the Bishop about

Reese. <u>When they reported Reese's abuse to the Bishop, this also served as notice to</u>

---

[3] BSA's Motion, at 4:10-13.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 4

BSA.  And when the Bishop told R.D. and his mother that the Boy Scouts and the church already knew about Reese, the Bishop made these statements as BSA's agent. At a minimum, the existence and scope of the Bishop's agency in this case is properly a question of fact for the jury.

### III.   FACTS

#### A.  BSA Controls the Entire Boy Scout Hierarchy.

BSA has three levels in its hierarchy – (1) BSA National Council, headed by the Chief Scout Executive; (2) Local Councils, headed by a Scout Executive; and (3) "chartered organizations", headed by a "chartered organization representative."  The chartered organization sponsors the scout troop, and for Lakewood Troop 190, its sponsor was Lakewood LDS Ward 5.  The Bishop of that ward was the charter organization representative for Troop 190.

#### 1.   BSA National.

BSA was incorporated in 1916 as a congressionally chartered corporation.  BSA's national headquarters originally were in New Brunswick, New Jersey and are currently in Irving, Texas.  Its bylaws establish that:

> The purpose of this corporation shall be to promote, through organization and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in scout crafts, to teach them patriotism, courage, self-reliance, kindred virtues, using the methods which are now in common use by boy scouts.

Petersen Decl., Ex. A, Terry Dep., at 89-90, Ex. 12 (emphasis supplied).

Critically for the issue here, BSA sets the leadership standards for all adult Scout leaders.  Id., at 50.  As part of their formal BSA training, Scout leaders are taught how to

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 5

engender trust between themselves and Boy Scouts.  <u>Id.</u>, at 78.  The Scout Oath itself encourages Boy Scouts to "honor and obey" BSA leaders.  <u>Id.</u>, at 127.  BSA specifically informs Boy Scouts they should trust their merit badge counselors, like Reese, telling them in the BSA Handbook "Merit badge counselors are among the finest men of the community."  <u>Id.</u>, at 125, Ex. 13 (BSA Handbook, 1965 Ed.).

In the 1960's BSA by and through its "Registration and Subscription Service" controlled the registration of all scouts and adult volunteers.  BSA's control extends to Scoutmasters and merit badge counselors – like Reese.  All of these positions, including merit badge counselors, are registered at BSA National.  <u>Id.</u>, at 110, 116.  The merit badges themselves, like the uniforms, are all designed and approved by BSA National.  <u>Id.</u>, 117-18.

BSA requires the troops to collect a standardized registration fee every year, and send this money to BSA. <u>Id.</u>, 40.  BSA also generates revenue from sale of its publications. <u>Id</u>  BSA owns and operates stores nationwide selling its uniforms, publications and other products, again making money on its products.  BSA is funded by the money from these fees collected by troops and from sales of BSA products. BSA cannot exist otherwise.  <u>Id</u>

### 2.  <u>Local Councils.</u>

From its inception, BSA chartered local councils to carry out Boy Scouts of America's purposes and programs.  <u>Id.</u>, 93.  All local councils must follow BSA's rules and regulations and must follow BSA's Charter and Bylaws.  <u>Id.</u>, 93-94.  Local councils cannot exist unless they adhere to these dictates of the BSA.  <u>Id.</u>

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 6

BSA also must approve all local council bylaws.  Id., 95.  In fact, BSA provides local councils with "standard local council articles of incorporation and bylaws" – a BSA form by which the local council can incorporate by filling out a handful of blank lines. *See, generally*, Local Articles and Bylaws.  Id., Ex.14.  BSA used these local articles and bylaws in 1967 and 1968.  Id.  Unsurprisingly, the local articles and bylaws vest a great deal of authority with BSA.  The BSA retains the power to dissolve the council itself at the discretion of BSA.  Local Articles and Bylaws, Article II [Articles] at 1 (local council corporation shall "dissolve in the event of revocation or termination of its charter from the Boy Scouts of America").  Id.  All property of a local council is held in trust for the "carrying out of the program of the Boy Scouts of America," and under the local bylaws any real property held by the local council must revert in ownership (or the net proceeds from sale) to BSA in the event of corporate dissolution.  Id., Article X [Articles of Incorporation] at 3, Article X [Bylaws] at 13.

James Terry, assistant Chief Scout Executive and the BSA's designated Rule 30(b)(6) witness, candidly testified that the work of the local council must be done within the framework of the Congressional Charter, the Bylaws and rules and regulations of BSA itself.  Id., at 104.  His admission was consistent with Article III, Purposes of the Standard Local Council Articles of Incorporation and Bylaws:

> The Corporation shall promote, within the territory covered t must by the Charter from time to time granted it by the Boys Scouts of America and in accordance with a Congressional Charter, Bylaws and rules and regulations of the Boy Scouts of America, the Scouting program . . ."

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 7

Id., Ex. 12 (emphasis supplied).  And the same BSA document specifically restricts Scout leadership "to those persons who are willing to subscribe to the declarations of principles" expressed in BSA's own Bylaws and rules and regulations.  Id., at 105.  In Mr. Terry's words:  "Every local council has to agree to abide by the Bylaws and the rules and regulations of the Boy Scouts of America."  Id., at 106. *See also, Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) (Holding: BSA is authorized to control leadership standards for its entire organization, including local councils and troops.)

Finally, BSA ultimately controls the appointment of the Local Scout Executive, in essence the CEO of the local council.  Petersen Decl., Ex. B.  When there is a vacancy in the local Council, it is required by the BSA to notify BSA, which in turn provides a short list of Scout leaders for consideration by the Council.  Id., 31-32, 135-136.  The Council is required by the BSA to hire its Scout Executive from this list.  In addition, even where the local Council has its own suggestion for a candidate, that person must be pre-approved by the BSA.  Id.  Moreover, every new professional scouter (those in the BSA who get a salary including the Scout Executive) must attend BSA sponsored training before becoming employed by any local council.  This training is on a wide variety of subjects including the potential for sex abuse of Scouts.  Id., 70.  The Scout Executive's pension is held by the BSA national.  In fact, when a Scout Executive moves from one council to another council, he still maintains his pension.  And upon retirement, the Scout Executive's pension is paid by BSA.  Id., 16.

### 3.  **Charter Organizations.**

A "charter organization" is the level below a local council, in BSA's hierarchical organizational chart.  This organization, typically a church or community center, operates the Scout troop and cub pack.  In order to exist, BSA itself must approve the application for a Charter, which lasts for one year.  Id., Ex. A, at 61.  BSA must approve the renewal of the Charter for the organization each year.  Id.  As Mr. Terry explained:

> A.  Do they have to – these local community organizations actually have to obtain a charter through Boy Scouts of America?
>
> B.  Yes, they do.
>
> Q.  And –
>
> A.  And it's an annual charter –
>
> Q.  Okay.
>
> A.  -- renewable every 12 months.
>
> Q.  And they pay fees or dues to Boy Scouts of America in order to maintain their status as a local chartered Boy Scout organization?
>
> A.  Yes, they do.
>
> Q.  Okay.  And they pay these fees to the Boy Scouts of America, Inc.?
>
> A.  Yes, through the local council.
>
> Q.  Okay.  In exchange for that charter?
>
> A.  Yes, sir.
>
> Q.  They cannot operate without have a charter given to them by Boy Scouts of America, Inc.; is that correct?
>
> A.  That is correct.

<u>Id.</u>, Ex. A, at 39-40.

In this case, the 1967 Charter for Lakewood Troop 190, (for the period February 28, 1966 to February 28, 1967), identifies Bishop Howard Hallmeyer as the "charter organization representative". <u>Id.</u>, Ex. C. This Charter also identifies the adult troop leaders – the "troop committee". <u>Id.</u>  Gary Reese is identified on the 1968 Charter (for February 28, 1967 to February 28, 1968) as a member of the troop committee. <u>Id.</u>  In the same Charter, Plaintiff R.D. (age 15) and his older brother Mark (age 17) are listed as Boy Scouts.  <u>Id.</u>

Every adult leader's application – including here, the Bishop and Reese – had to be approved by BSA National.  <u>Id.</u>, Ex. A, at 49-50.  ("No person shall be approved as a leader unless in the judgment of the Boy Scouts of America he possesses the moral, educational and emotional qualities deemed necessary for leadership . . . .")  <u>The Rules and Regulations</u> further make clear that Defendant BSA must approve all leaders.  <u>Id.</u>, Ex. D.  Article VIII § 3 cls. 1, 2 (all unit (i.e., Troop) leaders must be issued commissions by the national organization).  And all Troop leaders must be recommended by one of the Troop managing bodies, which includes the Bishop here.

In addition—to the extent there is any factual doubt about BSA's control over the leadership selection process at this lowest level —the Rules and Regulations of the Boy Scouts of America for the relevant time period state clearly that:

> All recommendations for commissions or certificates of membership for unit [Troop], district, and council Scouters under council supervision [i.e., all local adult volunteers] are subject to the ***approval of the local council*** before ***transmission to the national office*** of the Corporation. Said recommendations for unit Scouters [Troop leaders] must be

approved by the head of the chartered organization or by the chartered
organization representative.

<u>Rules and Regulations of the Boy Scouts of America</u>, Article VIII § 1, cl. 5 at 7 (1976)

(emphasis added), <u>Id.</u>, Ex. D. supra.

The charter application requires identification of a "chartered organization

representative".  <u>Id.</u>  This representative was "basically the manager of Scouting in a

Chartering organization, such as a church, who would be responsible for the operation of

the Cub Scout pack and the Boy Scout troop".  <u>Id.</u>, Ex. A, at 31.  In 1967 and 1968, the

LDS Bishop was the "charter organization representative" for Lakewood Troop 190.  <u>Id.</u>,

Ex. C.

<u>Each "charter representative" was automatically appointed to the local council's</u>

<u>executive board.  Id.  Indeed, the Head of the Troop, the charter representative such as the</u>

<u>Bishop, is considered a "Council Scouter"—an actual member of the council that **is**</u>

<u>Defendant Pacific Harbors Council.  Id., Article VIII § 1, cl. 2.</u>  Petersen Decl., Ex E.

In addition, BSA's standard Local Council Articles of Incorporation and Bylaws

automatically appointed the charter representative to the local council. "Each

institution…to which a charter is granted elects or appoints a representative…as a

member of the Local Council." <u>Id.</u>, Ex. A, Ex. 14.  BSA standard Local Council Bylaws,

Art. III, Sec. 1, Ex. H, Scoutmaster Handbook, p. 16, 1968.  BSA required this charter

representative "to become an active member of the Local Council…" <u>Id</u>, Art. III, Sec. 2.

<u>Because of his position on the Local Council, this charter representative was also</u>

<u>necessarily aware of BSA's procedures for addressing sex abuse</u> (discussed in Section III.

C.).

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 11

**B.  Scout Leaders Act on Behalf of the BSA in Expressing Scout Values, and the
BSA Controls That Expression.**

As explained, BSA absolutely controls the selection of Scout leaders and adult

volunteers.  Moreover, it even controls the selection of the local Scout Executive.

Critical to this control is that the BSA retains the right to remove Scout leaders for beliefs

or conduct wholly independent of and separate from Scouting, such as drug and alcohol

use, sexuality, and religious disposition.  Here, BSA retained the right to remove Scout

leaders such as Reese for pedophilic behavior.  BSA established the standards and

procedures for the entire organization for removal of such leaders.

In the case of *Boy Scouts of America v. Dale*, 530 US 640 (2000), this same

Defendant argued that *it alone* retains – and *must* retain as a matter of constitutional

principle – complete control in the selection of Scout leaders. Taking Defendant BSA's

brief on the merits in *Dale* as the admissions of a party, as judicial admissions[4], or at the

very least as facts not subject to dispute based on judicial estoppel[5], it is apparent that

BSA retains the right to control the conduct of its Scout leaders.  *Dale* then, in this

respect, is binding precedent on these issues in this case.

In *Dale*, BSA removed an openly gay man from troop leadership by revoking his

registration. BSA argued In its brief to the Supreme Court that it had the sole power to

decide whether being gay was in accord with BSA's standards of leadership -- <u>at the</u>

---

[4] "We have discretion to consider a statement made in [appellate] briefs to be a judicial admission, binding
on both this court and the trial court."  *Gospel Missions of Am. v. City of L.A.*, 328 F.3d 548, 557 (9th Cir.
2003).
[5] Under this doctrine, "a party should not be allowed to gain an advantage by litigation on one theory, and
then seek an inconsistent advantage by pursuing an incompatible theory."  18B Wright & Miller, <u>Fed. Prac.
& Proc.</u> § 4477, at 2 (2d ed. 2011).  *Maine v. United States*, 532 U.S. 742 (2001) emphasized the desire to
protect the integrity of the judicial process, the need for clear inconsistency, and the demand that the party
to be estopped have benefited from the prior inconsistent statement.  All three factors are present here.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 12

troop level.  This argument is an unmistakable admission that the BSA exercises
dominion and complete control over the single most vital position in a scout troop.  The
BSA exercises these leadership decisions throughout Scouting by and through its right to
refuse registration to those persons it deems not to uphold BSA's values.  While *Dale* was
a 2000 decision, there exist no question that the BSA exercised this type of control from
its inception.

Defendant BSA's *Dale* brief begins with a recitation that the "mission" of the BSA
is to "instill the values of the Scout Oath and Scout Law in youth[.]"  Defendant BSA's
Brief for Petitioners at 2 (citations to the *Dale* record and internal quotation marks omitted
throughout unless otherwise noted).  "Responsibility for inculcating Boy Scouting's values
is entrusted to the volunteer "Scout leaders."  Id. at 3.  The Scoutmaster, for example, is a
"wise friend to whom [the Scout] can always turn for advice."  Id.  This "advice" is not
limited to how to tie knots and set up tents, but includes the Scout leader answering
"questions about growing up, ***about relationships, sex***, or making good decisions."  Id.
(emphasis added).  Likewise, Scout leaders are instructed to "[b]e open and clear when
talking to [Scouts]" about these same intimate topics.  Id.  Scout leaders "necessarily teach
by example" by their mere presence around Scouts, and Scouts "rely on [Scout leaders] to
be consistent in [their] behavior and beliefs."  Id. at 3-4.  Defendant BSA refers to this
leading by example as one of the "responsibilities" of Scout leaders.  Id. at 4.

BSA thus views Scout leaders as "leaders" of the BSA itself.  Id. at 32-34.  To
become a Scout leader, a candidate must be approved by the sponsoring institution, the
local Council, "and Boy Scouts of America."  Id. at 4.  Merit badge counselors like Reese

must be approved by the Council and registered as adult volunteers by BSA, because

BSA in *Dale* asserted without qualification that "***No adult leader can be appointed***"

without BSA's annual approval.  Id. at 4 (emphasis added).  Besides formal approval

from the three Scouting entities, the prospective Scout leader "must pass muster under a

number of informal criteria designed to select individuals capable of accepting

***responsibility for the moral education and care of other people's children***," and meet

the "qualities deemed necessary by BSA[.]"  Id. at 4, 10 (emphasis added).  Scout

leadership is "not open to the public," and BSA also reserves the right to reject any

prospective Scout leader "for various views and behaviors which [*sic*] ***Boy Scouts of***

***America deems inconsistent***" with its values.  Id. at 4 (emphasis added).

   BSA enforces these strictures against local Troops.  In *Dale*, BSA "revoked" Mr.

Dale's registration for being openly gay.  Id. at 8.  Although he was a troop leader, the

Troop did not revoke his registration or dismiss him as a Scout leader.  The Scout

Executive sent Mr. Dale a letter revoking his registration; and in a later letter explained to

Dale that "the Boy Scouts specifically forbids membership to homosexuals."  App. 137.

BSA excludes these men because "private expressive associations have the right to

choose leaders[.]"  Id. at 20.  Not surprisingly, this "right to choose leaders" is a right

"***ultimately*** of Boy Scouts of America[.]"  Id. at 30.  The individual Troops themselves

are ***how*** Defendant BSA achieves its goal of "instill[ing] the values of the Scout Oath and

Scout Law in youth[.]"  Id. at 2.  *See* Id. at 40 ("Troops have a distinct mission and

purpose: to instill the values of the Scout Oath and Law").  <u>Troop leaders therefore can</u>

<u>be clearly seen to be acting on BSA's behalf in advancing BSA's values.</u>  Id. at 40-41

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 14

("Scouts, ***and even more so, Scout leaders*** must commit themselves to [Scout] values") (emphasis added).

In a recent order in this district, *Boy 1 v. Boy Scouts*, 2011 U.S. Dist. LEXIS 53742 (W.D. Wash. 2011), Judge Martinez opined in a footnote that *Dale* concerned only registration and not notice issues. Respectfully, this ruling was in error and our case is distinguishable. First, BSA <u>did</u> admit in its *Dale* brief that BSA controlled leadership standards and selection over the entire organization. In fact, this point was in essence the gravamen of its brief. BSA prevailed because the Supreme Court ruled that BSA was free to exclude gay men from Scouting. *Dale* concerns BSA's control over Scout leadership standards, not merely registration – in fact, registration is inextricably tied to leadership control, i.e., leadership approval is woven into the registration process. Second, this case concerns a different issue – BSA's control over sex abuse reporting procedures. *Boy 7* solely dealt with the IV Files.

## C.   <u>BSA Has Always Controlled Child Sexual Abuse Reporting and Discipline for the Entire Organization.</u>

Prior to the abuse in this case, BSA had well-established procedures for handling pedophiles in Scouting.

**The IV Files**. Almost from its inception, BSA implemented a record keeping system for leaders who did not meet its leadership standards. Originally this record keeping system was called the Red Flag Files. <u>Id.</u>, Ex. B, 80. Sometime thereafter the name was changed to the Confidential Files and then sometime in the 1970's or 80's the

name was changed again to the Ineligible Volunteer or IV Files.[6] <u>Id.</u>  Within these various incarnations, there was one category (among six) known as the perversion files which contained the names of those adult leaders who sexually abused youth.

In this system, BSA required the Council Executive to inform the BSA in writing (phone calls were also part of the reporting process) of all allegations of sexual abuse/misconduct of adult leaders.  The local scout executives gathered evidence of the allegations of sexual abuse including but not limited to: newspaper clippings, letters and interviews with relevant participants and mailed said information developed from this effort to the BSA's Registration and Subscription Department in New Jersey.  Only BSA – and no subordinate entity in the hierarchy – controls these files.

The entire "IV" file, including all notes of the investigation and of any review committee, is maintained solely by BSA National.  <u>Id.</u>, Ex. A, 66.  The local organization has never maintained a copy to this day.  <u>Id.</u>

**BSA's Reporting and Dismissal System**.  Since its inception in 1910, BSA had known of the potential for child sex abuse by adult leaders in Scouting.  <u>Id.</u>, Ex. 17. Accordingly, in 1919, BSA had started its "Red Flag" file system to track Scout volunteers excluded from leadership for molesting Boy Scouts.

By 1935, BSA had <u>thousands</u> of these files at its national headquarters, according to a statement of its Chief Executive in a <u>New York Times</u> interview. <u>Id.</u>, Ex. F.  By 1967 and 1968, when plaintiffs were abused, BSA had collected a significant body of information from every state regarding pedophiles in Scouting.

---

[6] These files will collectively be referred to herein as the "IV Files".

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 16

The existence of these files creates the logical inference that they were developed from a nationwide reporting system of such child molesters to Scout Executives, who in turn sent the information to BSA National.  This informal reporting system obviously required local information-gathering at the council, charter organization and troop levels. Because BSA required charter representatives to serve actively on their Local Council, these representatives – like the Bishop here – were the conduits for this information on Scout leaders who were sexual abusing Scouts.

At least as early as 1960, BSA had provided instruction to incoming local Scout executives at BSA's National Training Center about sexual abuse of Scouts.  Id., Ex. B, at 69.  BSA informed these new Scout leaders that BSA maintained files on these pedophile leaders at home office.  Id., 80-81.

On December 4, 1972, BSA, apparently recognizing that its existing reporting procedures were not being effectively transmitted to the Councils, sent a letter to Scout executives on this subject.  The letter stated this was "the first time such information has been printed", the logical inference being that previously the BSA had conveyed such directives orally.  Id., Ex. A, Ex. 3.  BSA had come to the obvious conclusion that its system required greater coordination and organization.  The letter attached a document titled "Maintaining Standards of Leadership", which begins:

> Since its inception, the BSA has maintained its right to set standards of leadership in the areas of age, citizenship, sex, education, morals and emotional stability.

Id.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 17

BSA thus reaffirmed its required procedures for dealing with sexual abuse of Scouts. This "codification" of BSA's existing system was established only a few years after plaintiffs' abuse. Under BSA's procedures, the Local Council was to have initiated an investigation, following receipt of information about abuse from the "charter organization representative" at the troop level, like the Bishop here. After such notice, the Scout Executive was required to follow BSA's procedures. Id., Ex. B, at 62-63. BSA thus relied on the local representatives to carry out BSA's procedures.

BSA <u>required</u> the Executive promptly report the suspected abuser to National. <u>Id</u>., at 57. <u>BSA</u> instructed the Executive to investigate and "secure hard evidence about the situation." <u>Id.</u>, Ex. A, Ex. 3. If the allegations were well-founded, BSA instructed the Executive to summon the suspected abuser and hand him a BSA form letter, advising that he was now "ineligible" to act as a Scout leader. <u>Id.</u> Thereafter, the leader was an "ineligible volunteer". BSA also instructed the Scout Executive not to discuss the matter further with the abuser. <u>Id.</u>

BSA also controlled the review process for any "appeals" from the Executive's determination, with the last "appeal" at the national BSA level, where its decision was final. <u>Id.</u>, 63-64. All review committees also acted under rules and regulations promulgated by BSA. <u>Id.</u>, at 65.

BSA required local leaders keep all information about the abuser and his activities <u>strictly</u> <u>confidential</u>. BSA's 1972 letter itself instructed the Scout Executive not to copy that letter or share it "beyond the <u>top</u> management of your council." The clear intendment of such a warning being that BSA national did not want the existence of the

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 18

confidential file system to be made known to any one person or entity in the BSA beyond those on the Council Id.  In the "dismissal interview", BSA instructed the Executive to tell the abuser that "BSA is not sharing this information with anyone."  Id.  And BSA's form "dismissal letter" told the abuser:  "We are making no accusations and will not release this information to anyone".

In 1976, BSA issued a revision of its "Procedures for Maintaining Standards of Leadership".  Id., Ex.4.  BSA's attached instruction memo explained that "the responsible local BSA chartered organization" was to identify suspected pedophile Scout leaders.  Id.  This duty was consistent with the Bishop's job to insure that the troop was being run in accordance with BSA's requirements that it be a safe program with safe leaders.

These Standards reiterated that sex abuse in Scouting was to be kept secret. Again, BSA told the child molester in the form letter that "[T]his decision [to suspend the abuser] and the reasons for it will be maintained as confidential."  Id.  The "evidence and the confidential record sheet" were sent to BSA "Registration and Subscription Service."  Id.  Critically, BSA instructed its leaders that:

> 11.  It cannot be over-emphasized that all persons concerned should treat the facts presented to the review committee as confidential and as not to be disclosed except on a "need to know basis" within BSA.

Id. (emphasis in original).

BSA thus established the exclusive standards and procedures for child sex abuse of Boy Scouts. [7]  From BSA's Registration and Subscription office in New Jersey, to the

---

[7] In the mid-1980's, BSA adopted "Youth Protection" guidelines.  This included the buddy system or "two-deep" rule, requiring that a Scout always be with two adults.  Later, BSA also provided educational materials to Scouts and their parents about child molesters, however, without mention of the danger from

local Council Executive, and down to the chartered organization representative, the investigation, discipline and records followed BSA procedures.  Critically, BSA did not instruct, nor did it want its leaders at any level, to report the abuse to parents, Scouts, or law enforcement.

**D.**     **The Perpetrator:  Gary Reese.**

Gary Reese was an important adult leader of Lakewood BSA Troop 190.  In 1965, Reese started as a librarian at the Tacoma Public Library, living with his mother.  Petersen Decl, Ex. G. Ward records confirm that Reese wanted to get involved in the Scout troop right away.  Id.

In 1965, the Bishop asked Reese to maintain a record for the troop of all merit badges earned by each Boy Scout.  Id.  Reese's control of these records for the next twenty years, gave him enormous power over Boy Scouts seeking advancement.  Id.  By 1967, Reese was a merit badge counselor and member of the Troop Committee.  Id.  For most of his life, he remained a key Scout leader in the troop and also served on the Mt. Rainier Council.[8]

**E. Reese Sexually Abused Each Plaintiff While Serving As a Scout Leader.**

---

adult Scout leaders.  BSA never told Scouts or parents about the IV Files.  The public learned about them in the Portland case.

[8] Reese was appointed to the following LDS and Boy Scout positions:

1.  Consultancy – genealogy, Reese Dep., p. 25; 2.  Seminary teacher, Dep., p. 26-27; 3.  Investigator for Church, Dep. p. 30; 4.  Executive Board of Mt. Rainier Council Member, Dep., p. 35; 5.  Keeper of Place Names, Dep., p. 36; 6.  Member – Mount Rainier Council, Boy Scouts of America, 1975 Budget Committee, Chairman Advancement Committee, Committee Chairman of Group 285, Dep., p. 39; 7.  Member – Executive Board of Mount Rainier Council of Boy Scouts of America, Dep., p. 40; 8.  LDS Home Teacher, Dep., p. 94; 9.  President, Young Men's group (YMMIA), Dep. p. 116; 10.  Second Councilor of Ward Bishopric, Dep. p. 118; 11.  Boy Scout Scoutmaster, Dep. 121; 12.  Boy Scout merit badge counselor, Dep., p. 142; 13.  Director, Aaronic Priesthood, Dep., p. 161; 14.  Boy Scout Explorer Advisor, Dep. p. 164; 15. Executive Secretary to Stake President of Lakewood Stake, Dep. p. 61.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 20

In the 1960s, Reese and Plaintiffs were members of the same LDS Ward and Scouts Troop 190 in Lakewood.  Reese took each Plaintiff on Scouting trips.  Petersen Decl., Ex. I, pages 61-62, 74, 89-91.  Reese also conducted Scouting activities at his home, including as a BSA-registered merit badge counselor helping Scouts on their merit badges.  Id.

In spring 1967, Reese acted as Plaintiff R.D.'s merit badge counselor for five merit badges:  fishing, citizenship in the nation, conservation of natural resources, home repairs and public speaking.  Id., Ex. J, pages 60-63, 80-82.  Ex. 6 of deposition.  Reese signed R.D.'s merit badge cards as his merit badge counselor or forged the name of another man in the Ward.  Id.  Reese also signed three of R.D.'s cards as R.D.'s Scoutmaster.  Id.

Plaintiff C.D. was a Cub Scout and his mother was his den mother and also was a member of the charter organization's board.  Petersen Decl., Ex. J, pages 27, 30.  In 1968, at age 11, C.D. joined Troop 190.  Id.

In 1967, Reese molested R.D. during a Boy Scout meeting at Reese's home.  Id., Ex. I, page 162.  The abuse occurred that summer, shortly after R.D. had earned his merit badges.  Id.  During a wrestling match outdoors directed by Reese, another boy kicked R.D. in the testicles.  Id., Ex. I, page 73-76.  Reese took R.D. to Reese's bedroom, laid him on his bed, and put lotion on his testicles and penis.  Id.  Reese masturbated the boy for about ten minutes.  Id.  R.D. was 14 or 15 years old.

Several weeks later, R.D. told his mother about Reese's abuse.  See Petersen Decl., Ex. I, pages 93-94.  She took R.D. and they met with the Bishop.  In their meeting,

R.D. shared the details of Reese's abuse with the Bishop.  Id., Ex. I, pages 94-95.

Critically, the Bishop told R.D. and his mother that the Church and the Boy Scouts

already were on notice that Reese had molested boys, ***before R.D.'s abuse***:

> A:  And I don't want any part of talking about it.  But the bishop
> asked me, you know, is this what happened.  And I go, yeah.
> And he goes, you know, calm down, calm down.  He says, <u>we
> already know about Gary and we talked to the – whatever the big
> Scout leader is – and we're dealing with this</u>; it's not – you
> know, it's not your fault, but we're dealing with this and Gary's
> being disciplined, he's – you know, <u>we're – the church and the
> Boy Scouts are taking care of it</u>.  What did she call it?  The
> Scoutmaster, whatever.  And you don't – we'll take note of it and
> that's all you need to do; we got it.

(Emphasis supplied).  <u>Id.</u>, page 94, line 23 through page 95, lines 1-8.

The evidence thus shows that <u>before</u> Reese abused R.D., BSA already was on

notice that Reese was molesting boys in the Lakewood Scout troop.  This prior notice is

established in the Bishop's above-quoted statement to R.D. and his mother.[9]  Furthermore,

as R.D.'s brothers Mark and Bart testified, Reese was known as "queer" who had a strong

interest in boys. <u>Id</u>, Petersen Decl., Ex. K, 48-49, 108-109, Ex. L, 9-10. Mark graduated

from Lakes High School in 1968, and thus gained this knowledge about Reese's

proclivities <u>before 1968</u>. <u>Id</u>.

After this meeting with the Bishop, BSA and LDS, acting properly, immediately

should have stopped Reese from having any further contact with boys.  But this did not

happen.  Instead, Reese remained a Scout and Church leader.

---

[9] The Bishop's statement is admissible as the Admission of a Party Opponent.  FRE 801(d)(2).  "Under these circumstances . . . [the Bishop] was qualified and had sufficient knowledge and responsibility to constitute a speaking agent."  *Hartman v. Port of Seattle*, 63 Wn.2d 879, 886, 389 P.2d 669 (1964).

As a result of their willful negligence in failing to keep Reese away from boys, the next year (1968) Reese repeatedly molested and raped R.D.'s younger brother C.D., who was 11 or 12 years old.  <u>Id.</u>, Ex. J, pages 20-22, 27-30, 32-34.  Reese thus abused C.D. **after** the BSA had prior notice that Reese posed a risk to children.

Like his brother the prior year, C.D. also told his mother that Reese had abused him. <u>Id</u>.  She took C.D. and they met with the Bishop. <u>Id</u>.  C.D. told the Bishop the details of Reese's sexual abuse, and the Bishop said they were taking care of Reese and to keep quiet. <u>Id</u>., Ex. J, pages 50-58, 60-65.

A few weeks later, the Bishop interviewed C.D. in a regular "Bishop's interview" at the church. <u>Id</u>, Ex. J, pages 43-44.  Again, C.D. reported Reese's abuse to the Bishop. <u>Id</u>, Ex. J, pages 43-44.  Tragically, the Bishop <u>again</u> failed to protect the boy.  Reese, also at the church, saw C.D. meeting with the Bishop. <u>Id</u>. Reese pulled C.D. aside, threatened him, and anally raped him in the baptismal area of the church. <u>Id</u>, Ex. J. 43-44.

## IV.    <u>ARGUMENT AND LAW</u>

The LDS Bishop, acting as BSA's charter representative, was BSA's agent on numerous issues – adult leadership registration, charter renewal, supervision of the troop leadership, and liaison with the local Council (on which BSA required him to serve).  He was responsible for ensuring the troop carried out BSA's standards of leadership. He was responsible for the safety of the Boy Scouts in the troop. He was responsible for making sure that the organization sent the registration fees to BSA, thus protecting BSA's financial interests.  In Bishop Ely's words (quoted at the beginning of this brief), "<u>Bishops are scout leaders</u>."

Accordingly, the Bishop was BSA's agent.  "The fact that [the Bishop and others] were volunteers does not impact our analysis.  A charitable organization may be held liable for the negligence of volunteers acting in an agency capacity."  *C.J.C.* v. Corp. of Catholic Bishop, 138 Wn.2d 699, 720, n. 10, 985 P.2d 262(1999) citing *Abel v. Firs Bible Missionary Conf.*, 57 Wn.2d 853, 855, 360 P.2d 356 (1961).

An agent's authority to bind his principal may be of two types:  actual or apparent.  *King v. Riveland*, 125 Wn.2d 500, 507, 886 P.2d 160 (1994).[10]  "Actual authority" may be "express" or "implied".  Id.  The Bishop's actual authority from BSA is both express and implied.

Under Washington law, whether agency exists is a question of fact for the jury. *Smith v. Hansen*, 63 Wn.App. 355, 363, 818 P.2d 1127 (1991), review denied, 118 Wn.2d 1023, 827 P.2d 1392 (1992) ("Agency is usually a factual question for the jury."); *Durias v. Boswell,* 58 Wn.App. 100, 104, 791 P.2d 282 (1990) (reversing summary judgment because of fact questions regarding agency); *O'Brien v. Hafer*, 122 Wn.App. 279, 281, 93 P.3d 930 (2004) (same holding).

> The question whether an agency has been created is ordinarily a question of fact which may be established the same as any other fact, either by direct or by circumstantial evidence; and whether an agency has in fact been created is to be determined by the relations of the parties as they exist under their agreements or acts, with the question being ultimately one of intention.

3 AmJur 2d Agency §21, at 525 (1986 ed.)

---

[10] Importantly, BSA did not disclose to Scouts or their parents any limitations on the local troop leaders' authority to handle such complaints.  "A party dealing in good faith with an agent who appears to be acting within the scope of his authority is not bound by undisclosed limitations on the agent's power."  *Parada v. State*, 75 Wn.App. 224, 231, 877 P.2d 231 (1994).  The local troop leaders also thus had apparent authority to receive complaints for BSA.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 24

A.      **BSA Granted the Bishop Actual Authority to Address Child Sex Abuse.**

1.      **Express Authority**.

Actual authority depends upon the objective manifestations made by BSA.  *King v. Riveland, supra*, 125 Wn.2d at 507.  "[T]he manifestations to the agent can be made by the principal directly, or by any means intended to cause the agent to believe that he is authorized or which the principal should realize will cause such belief."  *Blake Sand & Gravel v. Saxon*, 98 Wn.App. 218, 223, 989 P.2d 1178 (1999), quoting Restatement (Second) of Agency §26, cmt. b (1958).

"A master-servant relationship under agency principles may arise when one engages another to perform a task for the former's benefit."  *O'Brien v. Hafer, supra,* 122 Wn.App. at 281.  "In such a case, the one who seeks the benefit may either control or have the right to control the performance of the benefit."  Id., 122 Wn.App. at 281.  "The negligence of the agent is imputed to the principal because he has the right to control the acts of the agent."  Id.

"[A]n agency relationship results from the manifestation of consent by one person that another shall act on his behalf and subject to his control, with a correlative manifestation of consent by the other party to act on his behalf and subject to his control."  *Moss v. Vadman*, 77 Wash.2d 396, 402-03, 463 P.2d 159 (1969).  "The crucial factor is the right to control the manner of performance that must exist to prove agency."  *O'Brien*, 122 Wn.App. at 283; *see e.g.*, *McLean v. St. Regis Paper Co.*, 6 Wn.App. 727, 732, 496 P.2d 571 (1972) ("The doctrine of respondeat superior, which is the basis of vicarious tort liability in this jurisdiction whether an agent or an employee is involved,

requires that the one charged with imputed liability have control of or the right to control

the physical actions of the negligent actor."). But "[i]t is the existence of the right of

control, not its exercise, that is decisive." *O'Brien*, 122 Wn.App. at 281; *see e.g.*,

*Adamski v. Tacoma General Hospital*, 20 Wn.App. 98, 111-12, 579 P.2d 970 (1978).

      *Adamski* is instructive. There, Division 2 of our Court of Appeals considered

whether a trial court should have submitted to the jury the issue of an emergency room

physician's agency with a hospital. The hospital argued that nowhere in its contract with

the physician did the hospital reserve the right to exercise control over the actual medical

treatment that the physician rendered. The court rejected this distinction, holding that the

record contained substantial evidence that the physician "was performing 'an inherent

function of the hospital, without which the hospital could not properly achieve its

purpose,' . . . he was an integral part of the total hospital function or enterprise."

*Adamski*, 20 Wn.App. at 112. "Clearly, when one considers all the facts and

circumstances of the relationship between Tacoma General and its emergency room

physicians, a substantial and genuine issue arises as to whether that relationship is that of

principal and agent." Id.

      Similarly here, the Bishop, as BSA's charter representative, "was performing

inherent functions" for BSA, "without which [BSA] could not properly achieve its

purpose." *Adamski*, supra, 20 Wn. App. at 112. Just as the physician was the hospital's

agent in *Adamski*, the Bishop in this case was BSA's agent because "he was an integral

part of the total [BSA] function or enterprise." Id.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 26

Scout executives were required to report to BSA all deviations from BSA's standards of moral conduct, including suspected sex abuse.  After the Scout Executive's investigation of the pedophile Scout leader, BSA required that leader to forward the allegations (in the form of letters, interviews, news clippings, etc.) to BSA National. During the late 1960s, these procedures were the _exclusive_ means for handling sex abuse throughout Boy Scouting.  On the issue here, BSA manifested its intention to the Local Council, that sex abuse issues were _exclusively_ handled through the IV reporting system. (It is noted that the Chartered representative served on the Council.)  In essence then, BSA granted charter organization representatives, including the Bishop here, with the actual authority to receive complaints of sex abuse **_for BSA_**.

    **2.**    **Implied Authority**.

The Bishop, as the charter organization representative, also had implied authority to address sex abuse for BSA.  "Implied authority is actual authority, circumstantially proved, which the principal is deemed to have actually intended the agent to possess." _King v. Riveland, supra_, 125 Wn.2d at 507.  Such implied agency is inferred "from the words and conduct of the parties and by the circumstances of the particular case". _Turnbull v. Shelton_, 47 Wn.2d 70, 72, 286 P.2d 676 (1955).

"Authority to perform particular services for a principal carries with it the implied authority to perform the usual and necessary acts essential to carry out the authorized services."  _King v. Riveland, supra_, 125 Wn.2d at 507, quoting _Walker v. Pacific Mobile Homes, Inc._, 68 Wn.2d 347, 351, 413 P.2d 3 (1966).  Logically, in order for BSA's reporting and IV file systems to function, the charter representatives necessarily had to

report sex abuse complaints up the ladder. This was made explicit in BSA's 1976 version of the standards of Leadership, and the reasonable inference from the evidence is that charter representatives had the same duties in preceding years.

**B.**     **Notice from the Complaints to the Bishop About Reese Is Imputed to BSA.**

BSA was charged with prior notice of Reese's abuse from the information provided to the Bishop.  As a matter of law, a principal is charged with knowledge of facts known to its agent that are relevant to the agency.  *Deep Water Brewing, LLC v. Fairway Resources, Ltd.*, 152 Wn.App. 229, 268, 215 P.3d 990 (2009); *Kelsey Lane Homeowners Assoc. v. Kelsey Lane Co.*, 125 Wn.App. 227, 235, 103 P.3d 1256 (2005). This rule follows from the agent's duty to communicate her knowledge to her principal. *Deep Water Brewing Co., supra*, 152 Wn.App. at 268.  A principal is charged with facts known to its agent where the agent has actual or apparent authority in connection with the subject matter "either to receive the information, take action upon it, or to inform the principal or some other agent who has duties in regard to it."  *Denaxas v. Sandstone Court of Bellevue, LLC*, 148 Wn.2d 654, 666, 63 P.3d 125 (2003) (emphasis supplied) (internal quotation omitted); *Goodman v. Boeing Co.*, 75 Wn.App. 60, 85, 877 P.2d 703 (1994).

BSA repeatedly emphasizes that Reese is not identified in its IV Files.  Motion at 2, 9, 11.  BSA is properly estopped from this argument because BSA has refused to allow Plaintiffs discovery of these files, <u>as irrelevant to notice</u>, obtaining a protective order on this basis.  *R.D. v. BSA*, 2011 U.S. Dist. LEXIS 11061 (W.D. Wash. 2011).  BSA cannot have it both ways.

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 28

In *Goodman*, the Court of Appeals rejected the defendant's claim that information known to an agent cannot be imputed to the principal unless the agent is required to relay the information to the principal.  75 Wn.App. at 85.  At issue was medical information the plaintiff-employee had provided to Boeing's workers compensation's processing firm but which the firm did not relay to Boeing management.  The Court of Appeals agreed with the plaintiff that Boeing's agent's knowledge of her medical condition was imputable to Boeing because it was within the scope of agent's authority to receive and act on the information it received from the plaintiff.  Id. at 86.  In *Goodman*, the authority of the agent to "act on the information" it received from Boeing employees was to convey that information to Boeing.  Id.  And the employer alone had the authority to decide what action to take based on information its agent transmitted to it.  Id.

*Goodman* establishes that the information Plaintiffs and their mother provided to the Bishop is imputed to BSA, regardless of whether he actually conveyed that information or was even required to convey the information in question.

Accordingly, the Bishop's knowledge gained in his discussions with Plaintiffs and their mother was deemed to be also known by BSA itself.  *Lane v. Brown & Haley*, 81 Wn.App. 102, 108, 912 P.2d 1040 (1996), citing *Haller v. Wallis*, 89 Wn.2d 539, 547, 573 P.2d 1302 (1978); *State v. Parada, supra*, 75 Wn.App. at 224, 230 ("notice given to and knowledge acquired by an agent are imputed to its principal as a matter of law").

## V.  **CONCLUSION**

PLAINTIFFS' OPPOSITION
TO BSA'S MOTION FOR
SUMMARY JUDGMENT OF
DISMISSAL - 29

Plaintiffs "have submitted overwhelming evidence of notice" to BSA of Reese's propensity to sexually assault boys.  Thus, "summary judgment is inappropriate because there is sufficient evidence that [BSA] had notice of the possibility of the specific harm inflicted." *J.N. v. Bellingham School Dist.*, 74 Wn.App. 49, 871 P.2d 1106 (1994) (Court of Appeals reversed summary judgment dismissing claims against school district arising from sexual assault at school), citing *Christen v, Lee*, 113 Wn.2d 479, 498, 788 P.2d 1307 (1989) (although criminal assault is not a foreseeable result of furnishing liquor to an obviously intoxicated person, tavern liable if it had notice of the possibility of such harm).

Because the Bishop was BSA's agent, Plaintiffs' and their mother's reports of Reese's abuse to their Bishop was notice to BSA itself.  BSA thus had prior notice of Reese's proclivities.  Accordingly, BSA's motion for summary judgment should be DENIED.

DATED this 9th  day of December, 2011.

SULLIVAN & THORESON

By: Kevin P. Sullivan
       Kevin P. Sullivan
       Attorneys for Plaintiffs
       WSBA # 11987


BLACK, CHAPMAN, WEBBER & STEVENS


By: Thomas N. Petersen
       Thomas N. Petersen
       Attorneys for Plaintiffs
       WSBA #32643

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the December 9, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Kelly P. Corr                        *Counsel for Defendant Boy Scouts of America*
Ms. Barbara J. Kastama
Mr. Randy Squires
Corr Cornin Michelson
Baumgardner & Preece, LLP
1001 Fourth Ave., Ste. 3900
Seattle, WA 98154-1051
kcorr@corrcronin.com
Bkastama@corrcronin.com
rsquires@corrcronin.com


Mr. Francis S. Floyd                     *Counsel for Defendant Pacific Harbors,*
Mr. Thomas B. Nedderman                  *Boy Scouts of America*
Floyd, Pflueger & Ringer P.S.
200 West Thomas Street, Suite 500
Seattle, WA 98119-4296
ffloyd@floyd-ringer.com
Tnedderman@floyd-ringer.com


Mr. Charles C. Gordon                    *Counsel for Defendants Corporation of the*
Mr. Jeffrey Tilden                       *Presiding Bishop and LDS Church*
Mr. Michael Rosenberger
Gordon Tilden Thomas & Cordell
1001 4th Ave., Ste. 4000
Seattle, WA 98154
cgordon@gordontilden.com
jtilden@gordontilden.com
Mrosenberger@gordontilden.com

/ / /

/ / /

/ / /

CERTIFICATE OF SERVICE - 1

Mr. Kevin Sullivan                          *Counsel for Plaintiff*
Sullivan & Thoreson
701 Fifth Ave, Ste. 3470
Seattle, WA 98104
ksullivan@sullthor.com

DATED this 9th day of December, 2011.

BLACK, CHAPMAN, WEBBER & STEVENS

By: ___s/Beth E. Sund_____
        Beth E. Sund, Paralegal to
        Thomas N. Petersen
        Attorneys for Plaintiffs
        WSBA #32643

CERTIFICATE OF SERVICE - 2